# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HEALTHPRO THERAPY SERVICES LLC,    :    Civil No. 3:17-CV-01959
:
:
       Plaintiff/Counter-Defendant, :
:
       v.    :
:
RIDGEVIEW OPERATIONS LLC    :
d/b/a RIDGEVIEW HEALTHCARE    :
AND REHABILITATION CENTER,    :
:
       Defendant/Counterclaimant. :    Judge Jennifer P. Wilson

## <u>MEMORANDUM</u>

This is a case involving competing claims of breach of contract that was submitted to the court for decision following a three-day bench trial and post-trial submissions. At bottom, this is a lawsuit over a bill for services rendered that has remained unpaid since 2017. Based on the court's assessment of the evidence and arguments presented by the parties, the court finds in favor of Plaintiff on its breach of contract claim as well as Defendant's counterclaim. Accordingly, judgment will be entered in favor of Plaintiff.

### PROCEDURAL BACKGROUND

This matter was commenced on September 19, 2017, when Plaintiff HealthPRO Therapy Services ("HealthPRO") filed a civil action against Defendant Ridgeview Operations LLC d/b/a Ridgeview Healthcare and Rehabilitation Center ("Ridgeview") in the Court of Common Pleas of Schuylkill County, Pennsylvania.

(Doc. 1, ¶ 1.)  Thereafter, Ridgeview filed a notice of removal to this court.  (Doc.

1.)  HealthPRO filed an amended complaint on November 21, 2017, and

Ridgeview then filed its answer and counterclaim on December 12, 2017.  (Docs.

10, 16.)  HealthPRO subsequently answered the counterclaim.  (Doc. 18.)

HealthPRO brings two causes of action against Ridgeview.  The first claim

is for breach of the Therapy Services Agreement ("Agreement") based on

Ridgeview's failure to pay the invoices submitted by HealthPRO for therapy

services provided to residents of Ridgeview between November 2016 and March

2017.  (Doc. 10, ¶¶ 40–49.)  The second claim, pleaded in the alternative to the

breach of contract claim, is for unjust enrichment based on Ridgeview's receipt of

reimbursement from Medicare, Medicaid, and other third-party payors for the

therapy services provided by HealthPRO, and the subsequent failure by Ridgeview

to pay the amounts invoiced by HealthPRO.  (*Id.* ¶¶ 50–56.)  Ridgeview brings a

counterclaim for breach of the Agreement based on HealthPRO's failure to provide

therapy services and sufficient staff at Ridgeview as required by the Agreement.

(Doc. 16, ¶¶ 69–80.)

Once the pleadings were closed, the parties engaged in a combination of

settlement conferences and fact discovery that spanned all of 2018 and the first six

months of 2019.  The parties continued to engage in fact discovery until the end of

2019, when this case was reassigned to the undersigned on December 3, 2019.

Following a status conference with the court on January 23, 2020, the parties continued to conduct fact discovery.

Fact discovery concluded on July 1, 2020, and on the same date, HealthPRO filed a motion for summary judgment and a brief in support on its claims, though not on Ridgeview's counterclaim. (Doc. 57.) At that point, some procedural chaos ensued. Because that period of chaos is not at issue at present, the court simply notes that the details of this aspect of the procedural background are set forth in the order entered on October 23, 2020. (Doc. 79.) In the end, the court permitted HealthPRO to withdraw its motion for summary judgment in favor of proceeding with the bench trial scheduled for October 26, 2020. (Doc. 66.)

The court convened a bench trial on October 26, 2020, and the trial concluded on October 28, 2020. The trial has been transcribed. (*See* Docs. 88–90.) The parties simultaneously submitted proposed findings of fact and conclusions of law on December 7, 2020, and trial briefs on December 21, 2020. (Docs. 91–94.) Accordingly, this matter is ripe for review.

### JURISDICTION AND VENUE

The court has diversity jurisdiction in this case under 28 U.S.C. § 1332, because HealthPRO and Ridgeview are domiciled in different states and the amount in controversy exceeds $75,000. Venue is proper in this district pursuant to 28 U.S.C. § 1392 because: (1) the underlying events giving rise to HealthPRO's

causes of action arose in this district; (2) Ridgeview has a principal place of business in this district; and (3) Ridgeview regularly conducts business in this district.

## BURDEN OF PROOF

In order to prevail on its claim following a bench trial, a party must prove all elements of its claim by a preponderance of the evidence. *Hetzel v. Swartz*, 31 F. Supp. 2d 444, 447 (M.D. Pa. 1998). The court must make all decisions on the credibility and weight of the evidence and testimony, as well as on all legal issues. *Id.*

## FINDINGS OF FACT

### A. The Parties and Their Business Relationship

HealthPRO is a national organization that provides therapy services to hundreds of nursing homes across the United States. (Tr. I at 27.)[1] Ridgeview is a for-profit company that owned and operated a 111-bed skilled nursing facility in Shenandoah, Pennsylvania during the time at issue in this case. (*Id.* at 118, 124; Tr. II at 6–7.)

The parties stipulated and agreed that the Therapy Services Agreement, which was attached to Plaintiff's Amended Complaint (and admitted at trial as

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header. The trial transcript is referenced as "Tr. I, Tr. II, and Tr. III" with the roman numeral indicating the day of trial. The trial days were October 26, 27, and 28, 2020. (Docs. 88–90.)

4

Plaintiff's Exhibit 1), is a full and correct copy of the Agreement to which the parties are mutually bound. (Tr. I at 101–102; Doc. 76, p. 4, ¶ 4.) The Agreement was entered into by the parties on April 20, 2016. (P. Ex. 1.) The agreement provided that HealthPRO was retained as an independent contractor to provide physical, occupational, and speech therapy services to Ridgeview residents on an as-needed basis. (*Id.* at ¶ 1.) Ridgeview offered nursing care, hospice services, dietary care, social services, recreational services, housekeeping, and laundry services to residents, but those services were not provided by HealthPRO. (Tr. I at 106–107; Tr. II at 6–7.)

Pursuant to the Agreement, HealthPRO was obligated, *inter alia*, to arrange for the provision of services to Ridgeview residents who requested services from HealthPRO in accordance with the Agreement, all applicable laws and regulations, and the plan of care established by the physician responsible for the resident's care. (P. Ex. 1, ¶ 2(a).) Before HealthPRO could provide therapy services to a Ridgeview resident, a physician must issue an order authorizing such services in a "plan of care" for that resident. (Tr. I at 28–29.) HealthPRO was required to provide therapy services through qualified therapy personnel who were employed by or under contract with HealthPRO and who held all required therapy licenses to provide the services. (P. Ex. 1, ¶ 2(b).)

Under the terms of the Agreement, Ridgeview was obligated, *inter alia*, to admit residents; secure and review the required orders from physicians for therapy services; and determine each resident's classification under the "minimum data set" ("MDS") classification system.  (*Id.* ¶ 3(a).)  In sum, Ridgeview was responsible for communicating the needs of residents and the wellbeing of the residents.  (Tr. I at 29–30.)  Ridgeview employees decided whether to admit residents based on an assessment of whether they offered the services the person needed and whether the person had the financial means to pay for their care.  (*Id.* at 108–110.)  Ridgeview's registered nurse assessment coordinator "RNAC" was responsible for compiling information from the "plan of care team" (which includes nursing staff, therapists, dieticians, and social workers) to determine the resource utilization group ("RUG") classification for residents.[2]  (*Id.* at 111–112.)

Any person could request a referral for a physician's order for an evaluation based on a change in a resident's condition, including but not limited to a therapist. (Tr. I at 73–74.)  If a physician ordered a therapy evaluation, HealthPRO was obligated to complete that evaluation.  (*Id.* at 74.)  A HealthPRO therapist would

---

[2] The RUG is a classification system established by the state and federal government to put a resident into a particular group.  (Tr. I at 111.)  The RUG score captures all of the different types of services that Ridgeview provides to a resident.  (*Id.* at 113.)  The RUG determines the reimbursement rate for Medicare reimbursement purposes and Medicaid case mix index ("CMI") purposes.  (*Id.* at 115.)  In order to get a RUG classification for a resident, the tool that is used is the minimum data set ("MDS").  (Tr. II at 29.)  The data included in the MDS is provided by the clinician from each discipline who is providing services to a resident.  (Tr. III at 16.)

then determine the frequency and duration of the resident's therapy services.  (*Id.* at 92.)  Short of an evaluation, however, HealthPRO employees could conduct a hands-off screen of a patient to assess whether to request a physician's order for an evaluation.  (*Id.* at 92–93.)

The HealthPRO rehab director also conducted monthly "grand rounds" at Ridgeview to identify unmet therapy needs of Ridgeview residents.  (*Id.* at 92–94.) The records resulting from the HealthPRO "grand rounds" were maintained in each resident's chart.  The residents' charts were kept and maintained by Ridgeview. (*Id.* at 99–100.)  There was conflicting testimony at trial about whether HealthPRO was completing "grand rounds" during its final few months at Ridgeview.  Because the evidence that could have resolved this conflict (the residents' charts) was in Ridgeview's possession, and Ridgeview did not present this evidence or, at a minimum, testimony indicating that the residents' charts were reviewed for the purpose of determining whether "grand rounds" occurred, the court finds that "grand rounds" continued throughout HealthPRO's tenure at Ridgeview.

Ridgeview was also responsible for billing residents or their governmental or other third-party reimbursement sources for therapy services provided by HealthPRO.  (P. Ex. 1, ¶ 3(b); Tr. I at 46–47.)  The parties' Agreement has a section addressing "Denial of Payment by Reimbursement Sources," which provides, in pertinent part:

(c)     HealthPRO reserves the right to make any payments to [Ridgeview] in installments over time.  [Ridgeview] shall have no right of set-off against any amounts owed to HealthPRO based on a denial of payment for Services or for any other reason.

(e)     . . . Except to the extent explicitly provided in this "Denials of Claims" section, [Ridgeview] releases and discharges HealthPRO from any and all past, present and future liability, claims, demands, controversies, damages, actions and causes of actions of every kind and nature, related to any third party disallowance or denial of claim.

(P. Ex. 1, ¶ 5(c) and (e).)

## B. Ridgeview's Failure to Compensate HealthPRO for Therapy Services Provided from November 2016 to March 2017

The Agreement states, in relevant part, with respect to HealthPRO's

compensation for providing therapy services as follows:

(a)     <u>Compensation</u>.     [Ridgeview] shall compensate HealthPRO during the term of this Agreement for the provision of Services in accordance with the terms and conditions of this Agreement . . . . HealthPRO will be compensated by [Ridgeview] for the Services rendered from the first day of the calendar month to the last day of the calendar month . . . according to invoices submitted to [Ridgeview] for services rendered by HealthPRO.  Payment to HealthPRO pursuant to services rendered under this Agreement is not dependent upon [Ridgeview's] ability to collect such revenue.

(c)     <u>Invoices</u>.  HealthPRO shall submit to [Ridgeview], by the fifth (5th) business day of each month, an invoice for all Services rendered through the last day of the previous month.  [Ridgeview] shall remit payment in full as shown on each invoice within thirty (30) days from the date of the invoice.  [Ridgeview] must notify HealthPRO in writing of any dispute of any portion of an invoice within thirty (30) days of receipt of the invoice.  Failure to notify HealthPro within this thirty (30) day period shall be deemed [Ridgeview's] confirmation of its obligation under this Agreement to pay HealthPRO in full for the invoice.

(d)   <u>Late Payments</u>.  If [Ridgeview] does not pay HealthPRO within the time frames set forth herein, then [Ridgeview] shall pay a service fee of 1.5% (or the maximum rate allowable by law, whichever is less) on all outstanding amounts owed by [Ridgeview] for each thirty (30) day period beyond the due date; provided that, in no event shall interest be charged in excess of the amount permitted by applicable law.

(e)   <u>Collection Costs</u>.  [Ridgeview] will reimburse HealthPRO for all costs of collection of HealthPRO's invoices, including all collection agency fees, attorney's fees and costs, and court costs that HealthPRO incurs in the pursuit of payment of any delinquent invoices.[3]

(*Id*. ¶ 4.)

HealthPRO rendered therapy services to Ridgeview between November 1, 2016 and March 31, 2017.  (Tr. I at 101–102; Doc. 76, p. 3, ¶ 1.)  HealthPRO timely submitted invoices to Ridgeview for these services, which invoiced amounts totaled $212,910.50.  (Tr. I at 101–102; Doc. 76, pp. 3–4, ¶ 2; *see also* P. Exs. 2, 94.)  Ridgeview has not paid HealthPRO the invoiced amounts.  (Tr. I at 101–102, 121; Doc. 76, p. 4, ¶ 3.)  Ridgeview did not notify HealthPRO in writing or otherwise within the time permitted in the Agreement that it disputed any portion of the invoices at issue.  (Tr. I at 40, 121.)  Through October 1, 2020, the monthly service charges applicable to the principal amount due and owing from Ridgeview

---

[3]The Agreement also specifies that the prevailing party in any litigation arising out of or in connection with the Agreement, or the breach, termination, or validity thereof, shall be entitled to recover from the other party all of the costs incurred, including reasonable attorney's fees and costs.  (P. Ex. 1, ¶ 15(h).)  This attorney's fees provision does not "apply to, limit, or in any manner affect HealthPRO's rights to collect legal, accounting, court fees, costs and expenses" from Ridgeview for the collection of delinquent amounts due under Section 4 (relating to compensation) of the Agreement.  (*Id.*)

was $137,596.23, with service charges continuing to accrue at the rate of 1.5% of the principal, or $3,193.66 per month.  (*Id.* at 44–45; P. Ex. 95; P. Ex. 1, ¶ 4(d).) HealthPRO has incurred costs of collection, including attorney's fees.  (Tr. I at 42.)

### C. Termination of the Agreement

The Agreement was terminated by Ridgeview by letter dated March 8, 2017, with an effective termination date of April 1, 2017.  (P. Ex. 14.)  The Agreement specifies the following with respect to termination:

(b)    Termination.

(i)    Default.  Either Party may terminate this Agreement any time if the other party defaults in the performance of any material term or condition of this Agreement to be performed by it, and, subject to Section 6(c) below, such default continues for a period of thirty (30) days, or such longer period as may be required to effect a cure provided that the defaulting party initiates curative action within thirty (30) days and thereafter is diligently and in good faith pursuing such cure; . . .

(c)    Immediate Termination.    Either Party may terminate this Agreement immediately in the event of an act by the other party constituting gross negligence, willful misconduct, fraud or any other felonious act which is materially detrimental to the terminating party. . . .

(e)    Effect of Termination.  In the event of termination of this Agreement for any reason, such termination shall not affect or negate the obligation of [Ridgeview] to pay the fees to HealthPRO accruing prior to the effective date of termination . . . .  All fees for Services rendered by HealthPRO shall become immediately due and payable within five (5) days after the date of any termination hereunder notwithstanding anything set forth herein to the contrary.  In the event [Ridgeview] terminates this Agreement, [Ridgeview] must be current with all payment terms set out in this Agreement.

(P. Ex. 1, ¶ 6.)

Ridgeview's termination letter, which was signed by Louise Bekisz, the

Ridgeview Administrator,  generally cited "numerous factors" for the termination,

but specified only the following reasons:  (1) "the total lack of support given to the

new Director of Rehab at the facility"; and (2) "the inability to recruit and maintain

adequate Therapy staff as well as a dramatic decrease in the Facility's CMI which

can be directly tied back to your Therapy staff."  (P. Ex. 14.)  Ms. Bekisz admitted

that she did no financial analysis to support the statement in the March 8, 2017

letter about the cause of the drop in the CMI.  (Tr. II at 105–106.)

HealthPRO responded by letter two days later, stating that the term of the

Agreement would not expire until April 1, 2018.  (P. Ex. 15.)  On March 15, 2017,

Ridgeview corresponded with HealthPRO again, affirming the termination of the

Agreement as of April 1, 2017, and stating that the termination decision "is based

on the willful neglect and gross negligence exhibited by HealthPro in relation to

contracted rehabilitation services which is significantly & materially detrimental to

this facility."  (P. Ex. 16.)  In closing, Ridgeview stated that it expected that all

HealthPRO services would continue through March 31, 2017.  (*Id.*)  Although the

letter was signed by Ms. Bekisz, she testified that Ridgeview's owner/operator Leo

Gutman wrote the letter.  (Tr. II at 106.)  In the final correspondence regarding the

termination, HealthPRO's Chief Counsel sent a letter to Ridgeview dated March

24, 2017, denying the accusations of gross negligence or willful neglect.  (P. Ex. 93.)

By reference to the termination provisions in the Agreement, P. Ex. 1, ¶¶ 6(b) and (c)), Ridgeview never provided HealthPRO with a 30-day notice of default in order to allow HealthPRO to cure the alleged default.  (Tr. I at 60–61.) Rather, in its second letter to HealthPRO, Ridgeview appeared to rely on the "immediate termination" provision in the Agreement.  (*Id.* at 61; P. Ex. 16.)

**D. Ridgeview's Counterclaim**

The owner/operator of Ridgeview, Leo Gutman, asserts that HealthPRO was in breach of paragraph 2(b) of the Agreement by providing insufficient staffing. (Tr. I at 133.)  He also asserts that HealthPRO was in breach of section one of the Agreement because they provided insufficient services to the Ridgeview residents which caused irreparable harm to the residents.  (*Id.* at 134.)  Mr. Gutman concluded that Ridgeview suffered a loss of $120,000 based on the 17-point rate drop of CMI of February 1, 2017, which he asserts was caused by the insufficient staffing by HealthPRO.  (*Id.* at 144.)  Mr. Gutman believes that HealthPRO's insufficient staffing at Ridgeview caused the rate drop, and on that basis, he believes HealthPRO owes Ridgeview an offset of not less than $120,000.  (*Id.* at 132.)  Ridgeview has refused to pay HealthPRO's invoices from November 2016

to March 2017 because Mr. Gutman believes that Ridgeview's counterclaim for breach of contract should reduce the amount that Ridgeview owes.  (*Id.* at 131.)

### 1. HealthPRO Staffing Changes

When Ridgeview took over operations of the facility in March 2016, it kept HealthPRO as the therapy services provider at the facility for the following reasons:  "HealthPRO had a good reputation for therapy services, a provider, as a national provider of therapy services.  And the Schuylkill area, the Schuylkill County area in particular, was a difficult area to staff.  There was an existing staff already on-board in the facility and [Ridgeview] made the decision to retain the existing company in the anticipation of providing good care and good services for [the] residents."  (Tr. II at 9.)

In 2016, HealthPRO employed Paul Jacobs as the Rehabilitation Director at Ridgeview and Zeina Keruly as the Regional Manager.  (Tr. I at 64.)  At some point in 2016, Mr. Jacobs was moved to another position within HealthPRO and Ms. Keruly resigned from her position.  (*Id.*)  Mr. Jacobs was succeeded by Jillian Rinehimer from July 2016 to February 2017, and Ms. Keruly was succeeded by Marge Marvel with support from Devin Riley.  (*Id.* at 64–65.)

Ridgeview was very pleased with Mr. Jacobs and Ms. Keruly.  (Tr. I at 153–154.)   However, Ridgeview was not pleased with Ms. Rinehimer.[4]  (Tr. II at 15–16.)  Ridgeview also was not pleased with Mr. Riley and Ms. Marvel.  (*Id.* at 17–18.)  Mr. Gutman felt that the therapy program "began to fall apart" in December 2016.  (*Id.* at 18.)

Ms. Rinehimer submitted her resignation to HealthPRO in January 2017.  (*Id.*)  Mr. Gutman became concerned about the changes in HealthPRO staffing and communicated with HealthPRO employees about some of his concerns via email.  (*Id.* at 19–25; D. Exs. 52, 60.)  The administrator, Louise Bekisz, also communicated concerns about staffing on a few specific occasions via email to HealthPRO.  (Tr. II at 96–98; D. Exs. 72, 61, 56.)

After Ms. Rinehimer resigned, Kathleen Boris became the Interim Rehab Director at Ridgeview for HealthPRO.  (Tr. II at 139–140.)   During her directorship, in February and March 2017, she relied on PRN (or *per diem*) staff for some therapy services.  (*Id.* at 140; D. Ex. 9.)  Ms. Boris sent one email stating that hiring a full-time speech therapist for Ridgeview would enable them to "pick more people up."  (Tr. II at 142.)  She sent another email in February 2017

---

[4] Multiple witnesses testified to Ms. Rinehimer having "problems" or "issues" and using leave towards the end of her employment with HealthPRO.  In fact, Ms. Rinehimer was pregnant and suffered from morning sickness.  (Tr. II at 153.)

expressing her view that a full-time physical therapist was needed at Ridgeview. (*Id.* at 143; D. Ex. 10.)

During the time period from December 2016 to February 2017, a HealthPRO recruiter named Whitney Deck was working on filling the full-time physical therapist and speech therapist positions at Ridgeview as well as assisting with securing coverage while the positions remained open. (D. Exs. 75–91.) Although HealthPRO was working on hiring qualified individuals for those positions, they had difficulty because of job market conditions at that time and the location of the facility. (D. Ex. 91, pp. 59–60.) Despite the delay in filling the full-time therapist positions, HealthPRO was able to meet all therapy needs during that period by qualified HealthPRO employees from other facilities and temporary *per diem* staff, or contract workers providing coverage. (Tr. I at 67–68.)

Prior to the March 2017 correspondence from Ridgeview's Administrator, Ridgeview had not previously notified HealthPRO that HealthPRO had failed to provide therapy services for residents of Ridgeview at any time. (Tr. I at 40–41, 58–59, 119.) There was no documented instance when a Ridgeview resident did not receive an evaluation or therapy services that were ordered by a physician during the time period of November 2016 to March 2017. (*Id.* at 41, 62, 66, 147; Tr. II at 47, 50, 99–101, 147.) Ridgeview never notified HealthPRO that any therapy order under a physician's plan of care was not fulfilled. (Tr. I at 62, 66,

68, 83.)  Finally, Ridgeview never notified HealthPRO that the temporary staff who provided coverage while the full-time physical therapist positions remained open had failed to meet a resident's need or deliver therapy services as ordered by a physician's instruction.  (*Id.* at 68.)

Based on the data presented at trial, there was no reduction in on-site hours worked by HealthPRO staff at Ridgeview.  Comparing the first six months of 2015, when HealthPRO first began providing therapy services to Ridgeview, to the last six months that HealthPRO provided therapy services at Ridgeview, there was a 23 percent increase in labor hours worked by HealthPRO employees on-site at Ridgeview.  (*Id.* at 87; P. Ex. 77.)  In addition, comparing the hours worked by HealthPRO employees in the final five months of the Agreement to the same months in the prior year, the therapy service hours worked were higher in each category (with the exception of speech therapy in February 2017) in the final time period.  (Tr. I at 88–89; P. Ex. 96.)  Finally, comparing the hours worked on-site by HealthPRO's evaluating clinicians only, as well as all staff from the period of June 2016 to October 2016 and November 2016 to March 2017, there was an increase in hours worked in both categories in the final five months of HealthPRO's contract with Ridgeview (twelve percent and ten percent, respectively).  (Tr. III at 59–60; P. Ex. 99.)

Accordingly, the court finds that the therapy staff provided by HealthPRO to work at Ridgeview from November 2016 to March 2017 was sufficient to fulfill HealthPRO's obligations to Ridgeview under the Agreement.

### 2. Ridgeview's CMI Rate Drop in February 2017

The CMI average for Medical Assistance residents, which is based on the RUG classifications for the residents, effectuates the rate that Medicaid will pay to a facility per patient for each day. (Tr. II at 29.) The CMI report for the February 2017 "picture date" for Ridgeview for Medicaid residents dropped by 17 points from the previous CMI of November 1, 2016 down to 1.03. (Tr. II at 27; D. Ex. 47.) Ridgeview's CMI in February 2016 was 1.15, in May 2016 it was 1.16, in August 2016 it was 1.17, and in November 2016 it was 1.19. (D. Exs. 43, 44, 45, 46.) Ridgeview's CMI in May 2017 rebounded to 1.14.[5] (D. Ex. 48.) Ridgeview's CMI in August 2017 was 1.15, and in November 2017 it was 1.21. (D. Exs. 49, 50.)

The change in CMI score caused a change in the payment rate from the Commonwealth for Ridgeview residents covered by Medicaid. (Tr. II at 38; D Ex. 62, 63.) The rate sheets are issued twice per year. The rates are adjusted retroactively. When there is a reduction in the effective rate versus the rate that

---

[5] The "picture date" of May 2017 included two months when HealthPRO was the therapy services provider and one month when a successor provider was working with Ridgeview. (Tr. II at 36.)

was paid, then there must be a recoupment of the amount that the Commonwealth overpaid to the facility.  (Tr. II at 40–42.)  At the end of 2017, the Commonwealth advised Ridgeview that it owed a recoupment of $119,000.  (*Id.* at 42; D. Ex. 65.) This recoupment figure is the basis for Ridgeview's calculation of damages.  (Tr. II at 42.)

The only evidence presented by Ridgeview in support of the assertion that the CMI rate drop was caused by HealthPRO's "insufficient staffing" was the opinion testimony of Mr. Gutman (the credibility of which is addressed in the next section).  Contrary to Mr. Gutman's opinion about the causation for the rate drop, there were several possible contributing factors.

First, Ridgeview's RNAC was responsible for determining each resident's MDS and the resulting RUG classification.  (*Id.* at 63.)  If an inaccurate RUG classification was assigned to a resident because of a faulty MDS, that would affect CMI.  (*Id.*)  In a survey completed by the Pennsylvania Department of Health in October 2016, it was determined that Ridgeview's nursing staff failed to accurately conduct MDS assessments in ten of nineteen sampled residents.  (*Id.* at 67.)  In the follow up survey in December 2016, the Department of Health concluded that Ridgeview failed to accurately conduct MDS assessments for five of fourteen sampled residents.  (*Id.* at 68.)  It is clear that the MDS accuracy problem was not solved at Ridgeview as of late 2016.  And the inaccuracy issue with MDS

18

assessments translated into inaccurate RUG scores and potentially impacted the CMI as well.  (*Id.* at 70.)

Second, the "picture date" of February 1, 2017 captured the details of what transpired with residents at Ridgeview in the preceding ninety-two days.  (*Id.* at 42.)  In any ninety-two-day period, patient population fluctuates for a variety of reasons, including new admissions, deaths, hospitalizations, transfers to acute care, or changes in patient acuity.  (*Id.* at 43; Tr. III at 43–45.)   And services provided to a resident may fluctuate based on changes in clinical need.  (Tr. III at 42.)  A change in one resident's RUG score during the period could impact the CMI at the end of the quarter.  (Tr. II at 110.)

Looking specifically at the CMI records for Ridgeview for the November 2016 and February 2017 "picture dates," several factors may have influenced the drop in CMI score:  (1) there was a five-resident reduction in the number of Medical Assistance residents (from sixty-nine to sixty-four); (2) there was a four-resident reduction in the number of residents receiving higher-CMI "extensive services" (from seven to three); and (3) there was a six-resident increase in the number of residents in the lowest category (from zero to six).  (Tr. III at 46–47.)

Ridgeview experienced a CMI rate drop from November 2016 to February 2017 that resulted in a recoupment payment by Ridgeview of $119,000.  However, the court finds that there were multiple factors that may have contributed to the

rate drop, and staffing levels by HealthPRO was not proven to be the sole cause of the rate drop.

### E. Leo Gutman Was Not Credible

Mr. Gutman's opinion testimony was the primary evidence relied upon by Ridgeview in support of its counterclaim.  For the reasons detailed in this section, individually and in combination, the court finds that Mr. Gutman's testimony was not credible.  As a result, the court does not rely on his opinion as evidence in support of Ridgeview's counterclaim.

The first issue with Mr. Gutman's credibility was the false reporting of HealthPRO's invoices to Medicare for reimbursement.  For the time period of November 2016 to March 2017, Ridgeview–under Mr. Gutman's leadership–billed Medicare and received reimbursement from Medicare for therapy services provided by HealthPRO, but failed to issue payment to HealthPRO for those services.  (Tr. I at 45–48, 121–122; P. Ex. 3.)

On the first day of trial, after Plaintiff established this fact in support of its unjust enrichment claim, the court convened a conference with counsel to express a concern that the issue of reimbursement from Medicare for the therapy services provided and invoiced by HealthPRO that remain unpaid by Ridgeview may generate collateral consequences for Ridgeview.  (Tr. I at 48–50.)  After the court raised this concern with counsel, the court allowed a recess for counsel to confer

with their clients.  (*Id.* at 50.)  Following the recess, Ridgeview's counsel indicated that curative measures would be taken.  (*Id.* at 51.)

Later that same day, Mr. Gutman testified that reporting the HealthPRO costs to Medicare without paying HealthPRO was problematic, and that was why he amended the cost report to Medicare.  (*Id.* at 147; D. Ex. 73.)  However, Mr. Gutman acknowledged that he only decided to amend the cost report on that day of trial after counsel pointed out to him that he may have violated federal law.  (Tr. I at 147–148.)  Mr. Gutman was aware of the "problematic" nature of the cost report for several years, but only decided to submit an amended cost report after concern was expressed at trial.  The court concludes that Mr. Gutman submitted a false report to Medicare, and did not feel compelled to correct the falsehood for any reason other than to address an issue raised in the context of litigation.  Mr. Gutman's decision to submit the false report and his subsequent failure to amend it prior to trial–standing alone–cast significant doubt on his credibility.[6]

The second issue with Mr. Gutman's credibility was the denial of material facts for three years without a valid factual basis.  Mr. Gutman reviewed the answer and counterclaim as member and operator of Ridgeview.  (Tr. I at 139.)  Plaintiff's counsel asked Mr. Gutman about the basis for several material facts that

---

[6] In reaching this conclusion, the court has not considered Exhibit A attached to Ridgeview's post-trial brief, Doc. 93, as the document was submitted to the court at a time when HealthPRO had no opportunity to address the exhibit.

he denied in Ridgeview's answer to HealthPRO's amended complaint in December 2017, after Mr. Gutman had admitted these same facts at trial.  In each instance, Mr. Gutman testified that he could not recall his basis for asserting the denial in Ridgeview's answer other than possibly the "offset of the issue."  (*Id.* at 135–139.) Most significantly, Mr. Gutman admitted that he knew the amount of what he perceives to be the amount of Ridgeview's loss or "offset" as of December 2017. (Tr. II at 46.)  That alleged loss amount was not included in Ridgeview's answer and counterclaim filed on December 12, 2017.  (Doc. 16.)

The third issue with Mr. Gutman's credibility was the inconsistency in some of his statements and positions.  For example, Mr. Gutman admitted that contrary to what was stated in the termination letter Ridgeview sent to HealthPRO on March 15, 2017, P. Ex. 16, he does not allege therapy negligence in this case.  (Tr. II at 53.)  Rather, his issue is the loss of revenue arising from fewer therapy needs being identified by HealthPRO.  (*Id.*)   In addition, Mr. Gutman testified that his concern about reduced therapy services first arose in January 2017.  However, he refused to pay HealthPRO's invoices from November and December 2016, which refusal had no basis whatsoever at the time payment was refused initially. Moreover, Mr. Gutman continued to allow HealthPRO to provide therapy services to Ridgeview residents for several months despite his view that their insufficient staffing was in breach of the agreement and causing harm to residents.  (*Id.* at 55–

56.)  Finally, Mr. Gutman continued to insist at trial that the only possible cause of

the CMI rate drop was insufficient staffing by HealthPRO despite his knowledge

of the problems with MDS assessments by the Ridgeview RNAC.  (*Id.* at 63–70.)

CONCLUSIONS OF LAW

Both parties assert a breach of the Agreement.  Under Pennsylvania law,[7] a

breach of contract is established by proving: (1) the existence of a contract,

including its essential terms; (2) a breach of a duty imposed by the contract; and

(3) resultant damages.  *See Key Consol. 2000, Inc. v. Troost*, 432 F. Supp. 2d 484,

487 (M.D. Pa. 2006) (citing *Corestates Bank N.A. v. Cutillo*, 723 A.2d 1053, 1058

(Pa. Super. Ct. 1999)); *see also Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C*

*v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).  The

court concludes as follows with respect to each party's breach of contract claim.

### A.    HealthPRO Proved That Ridgeview Breached the Agreement by Failing to Compensate HealthPRO for Therapy Services Invoiced

The existence of a contract has never been disputed in this case.  The

Agreement is the contract, and its essential terms are clear and unambiguous.

Pursuant to Paragraph 4(a) of the Agreement, Ridgeview had a duty to compensate

---

[7] When a federal district court sits in diversity, as it does here, it applies the substantive law of the forum state to resolve the merits of the controversy.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938).  In this diversity case, the forum state is Pennsylvania, and so Pennsylvania law applies.  The parties' Agreement also specifies that the Agreement shall be construed and enforced pursuant to the laws of the state where the skilled nursing facility is located, which is Pennsylvania.  (P. Ex. 1, ¶ 15(f).)

HealthPRO for the provision of therapy services rendered each month in accordance with invoices submitted by HealthPRO. HealthPRO timely submitted invoices for the months of November 2016 through March 2017 pursuant to Paragraph 4(c) of the Agreement. Ridgeview did not notify HealthPRO of any dispute of any portion of any of the invoices at issue as permitted in Paragraph 4(c). Ridgeview's failure to notify HealthPRO of a dispute regarding the invoices is deemed to be a confirmation of its obligation to pay the full amount invoiced pursuant to Paragraph 4(c). Ridgeview breached this duty by failing to remit payment in full within thirty days from the date of each invoice, as required by Paragraph 4(c) of the Agreement.

As a result of Ridgeview's breach of the Agreement by failing to pay the invoiced amounts, HealthPRO suffered damages in the principal sum of $212,910.50. In addition, pursuant to Paragraph 4(d) of the Agreement, Ridgeview must pay a service fee on the outstanding amount. As of this date, the total service fee owed by Ridgeview is $155,109.80. In addition, Ridgeview must reimburse HealthPRO for all costs of collection of the invoices, including attorney's fees and costs and court costs pursuant to Paragraphs 4(e) and 15(h) of the Agreement.

Because the court finds in favor of HealthPRO on its breach of contract claim, the court need not address HealthPRO's unjust enrichment claim, which was pleaded in the alternative.

**B.     Ridgeview Failed to Prove that HealthPRO Breached the Agreement**

Ridgeview argues that HealthPRO breached the Agreement by failing to provide "adequate" or "sufficient" therapy services to Ridgeview residents.  Once again, the parties do not dispute the existence of the contract.  However, the duty that Ridgeview alleges was breached is not found in the Agreement.

With respect to the duty at issue, the therapy services that HealthPRO was obligated to provide at Ridgeview are set forth in Paragraph 2(a) of the Agreement.  HealthPRO was obligated to arrange for the provision of services to Ridgeview residents who requested services from HealthPRO in accordance with the Agreement, all applicable laws and regulations, and the plan of care established by the physician responsible for the resident's care.  HealthPRO was required to provide therapy services through qualified therapy personnel who were employed by or under contract with HealthPRO and who held all required therapy licenses to provide the services.  The words "sufficient" and "adequate" do not appear in Paragraph 2(a) of the Agreement.  Moreover, the Agreement does not specify that the therapy services must be "sufficient" or "adequate" by any measure other than what is specified in Paragraphs 2(a) and (b) – the provision of services required by the plan of care for each resident by qualified therapy personnel.

Ridgeview has failed to prove that HealthPRO breached its duty to provide services required by the plan of care for each resident by qualified therapy

personnel.  Ridgeview did not present evidence of a single instance when a Ridgeview resident did not receive an evaluation or a physician-ordered therapy service.  Ridgeview never notified HealthPRO of any Ridgeview resident's therapy needs not being met.  And, although Ridgeview expressed dissatisfaction with the temporary staff covering the full-time speech and physical therapist positions that were vacant, Ridgeview never notified HealthPRO that the temporary staff were not qualified or failed to deliver physician-ordered evaluations or therapy services.

To be sure, Ridgeview was increasingly dissatisfied with the changes in staffing and lack of full-time therapists from January to March 2017.  Ridgeview complained to HealthPRO about the temporary staffing during this time period.  However, Ridgeview has not proven that the temporary staff was in any objective, measurable way "insufficient" or "inadequate" to fulfill HealthPRO's contractual duty to provide therapy services.  Indeed, the data presented at trial demonstrated an <u>increase</u> in on-site hours worked by therapy staff at Ridgeview during the November 2016 to March 2017 time period.  Although Ridgeview was clearly displeased with the changes in HealthPRO staffing, Ridgeview has failed to demonstrate that the temporary staffing resulted in a breach of HealthPRO's duty under the Agreement.

Finally, even assuming that the changes in HealthPRO's therapy staff constitute a breach of the Agreement, Ridgeview failed to prove that such breach

caused Ridgeview to suffer damages.  Ridgeview claims to have suffered a loss of

$120,000, which was the amount Ridgeview had to pay to the Commonwealth of

Pennsylvania as recoupment when its CMI rate dropped in February 2017.[8]  The

rate drop and subsequent recoupment amount were proven.  However, Ridgeview

argues that the sole and exclusive cause of this loss was the insufficient staffing by

HealthPRO, alleging that nothing else changed at Ridgeview during the time

period at issue.

The court concludes that Ridgeview also failed to prove causation.  The only

evidence that Ridgeview presented in support of its theory of causation was

opinion testimony from Mr. Gutman.  For the reasons explained above, the court

did not find Mr. Gutman's testimony to be credible.  Moreover, the court has

found, based on the credible evidence presented, that there were other factors that

---

[8] In Ridgeview's post-trial submissions, Ridgeview contends that HealthPRO's staffing issues also negatively impacted patient care.  Ridgeview does not cite any portion of the record in support of this serious assertion.  The court concludes that there is no record evidence that could be cited in support of this assertion.  Moreover, Mr. Gutman expressly admitted at trial that he does not allege any instance of "therapy negligence" by HealthPRO.  (Tr. II at 53.)  The court is astonished that Ridgeview persists in this argument at this point in the litigation despite the complete absence of evidentiary support.

In addition, at pages 5 to 6 of its post-trial brief, Doc. 93, Ridgeview asserts that HealthPRO employee Rob Oulette "questioned whether the drop was caused by HealthPRO's turnover in leadership at the Ridgeview facility.  Indeed, HealthPRO was aware that its mismanagement of the Ridgeview facility caused the drop in RUG Rate."  Ridgeview does not – and cannot – cite the transcript in support of this assertion.  This statement does not appear anywhere in the record before the court.  This appears to be a complete fabrication by Ridgeview.

may have contributed to the CMI rate drop that are not attributable to HealthPRO, while staffing levels by HealthPRO was not proven to be a contributing factor.[9]

Ridgeview has not proven that HealthPRO's staffing issues amount to a breach of contract. However, the court concludes that it was a driving factor in Ridgeview's decision to terminate the Agreement, and that Ridgeview's dissatisfaction with the working relationship with HealthPRO was genuine. However, there is no claim in this case arising from the termination of the Agreement. HealthPRO only asserts a breach of Ridgeview's duty to pay for the services invoiced. The court concludes that Ridgeview's March 15, 2017 letter invoked the "immediate termination" clause of the Agreement in Paragraph 6(c). Under the plain, unambiguous language of Paragraph 6(c), the Agreement should have been terminated as of March 15, 2017. However, Ridgeview insisted that HealthPRO continue to provide therapy services through the end of the month, and HealthPRO obliged that request. Pursuant to Paragraph 6(e) of the Agreement, the termination did not relieve Ridgeview of the obligation to pay the fees invoiced by HealthPRO. To the contrary, under this provision of the Agreement, Ridgeview

---

[9] Ridgeview also has not presented any argument to explain why it is entitled to seek relief from HealthPRO arising from the Commonwealth of Pennsylvania Medicaid recoupment in the face of Paragraphs 5(c) and (e) of the Agreement. According to these provisions, Ridgeview agreed that it could not make any demand of HealthPRO related to any third-party disallowance of a claim or offset any amount owed. The court construes the recoupment to be a retroactive disallowance of a portion of Ridgeview's Medicaid claim, and concludes that Ridgeview is precluded from demanding damages from HealthPRO relating to this disallowance.

was obligated to be current with all payments to HealthPRO when it terminated the Agreement.

In order to avoid the consequences of its breach of its duty to pay HealthPRO, Ridgeview contends that HealthPRO's "material breach" of its duty to provide "sufficient" or "adequate" staffing absolved Ridgeview of its duty to pay for the services rendered.  This argument fails, because Ridgeview has not proven a duty or a breach – material or otherwise.[10]

### C.    The Court Will Defer Ruling on the Amount of Damages

The court will defer ruling on the total amount of damages owed by Ridgeview pending review of HealthPRO's documentation concerning attorney's fees and costs as well as court costs.  The order accompanying this Memorandum will set forth a schedule for submissions on this component of damages.  Finally, after the court computes the attorney's fees owed by Ridgeview, the court will account for the attorney's fees owed by HealthPRO as an offset.  (*See* Tr. III at 77– 78.)

---

[10] Because the court has concluded that Ridgeview failed to prove any breach of duty by HealthPRO, the court need not address HealthPRO's argument that Ridgeview elected against the right to rescind or retroactively terminate the contract by continuing to benefit from HealthPRO rendering therapy services.

29

## CONCLUSION

For the foregoing reasons, the court finds in favor of HealthPRO on its breach of contract claim and on Ridgeview's counterclaim and will enter judgment accordingly.  The court defers ruling on the total amount of damages owed by Ridgeview pending review of the parties' submissions on HealthPRO's attorneys' fees and costs.  An accompanying order will follow.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania


Dated: March 15, 2021